UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JEROME RODRIGUEZ,                               :

                    Plaintiff,            :

           -against-                            :

MICHAEL J. ASTRUE,                             :
Commissioner of Social Security,[1]

                         :

              Defendant.
--------------------------------------------------------x

                                  **REPORT AND RECOMMENDATION TO THE HONORABLE BARBARA S. JONES**

                                  02 Civ. 1488 (BSJ)(FM)

**FRANK MAAS**, United States Magistrate Judge.

I.    <u>Introduction</u>

        Plaintiff Jerome Rodriguez ("Rodriguez") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), to seek review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits.  Rodriguez has moved and the Commissioner has cross-moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings.  For the reasons that follow, I recommend that Rodriguez's motion be denied and the Commissioner's motion be granted.

---

      [1]     Michael J. Astrue, the current Commissioner, has been substituted as the defendant pursuant to Fed. R. Civ. P. 25 (d).

II.    Background

    A.    Procedural History

        On January 21, 1999, Rodriguez filed an application for Social Security

disability benefits in which he alleged that he became disabled on May 14, 1998, due to

right knee and back problems.  (R. 474-77).[2]  After the Social Security Administration

("SSA") denied the application initially and on reconsideration, Rodriguez requested a de

novo hearing before an Administrative Law Judge ("ALJ"), which was held before ALJ

James Reap on January 4, 2000.  (Id. at 104-25).  By Order dated January 15, 2000, ALJ

Reap vacated the reconsideration determination and remanded the case for evaluation of

Rodriguez's alleged mental disorder, an issue raised for the first time at the hearing.  (Id.

at 58-59, 121-24).

        On June 16, 2000, after reviewing certain updated reports, including a

report from Rodriguez's psychologist,[3] the SSA again denied Rodriguez's application.

(Id. at 63-65).  Accordingly, on June 23, 2000, Rodriguez requested another hearing.  (Id.

at 69).  ALJ Reap held that hearing on March 13, 2001, (id. at 126-39), after which he

issued a written decision on June 28, 2001, which concluded that Rodriguez was not

---

    [2]    Citations to "R." refer to the two-volume administrative record filed by the
Commissioner.  (Docket Nos. 7, 12).

    [3]    The Explanation of Determination incorrectly refers to a report by the
psychologist dated May 5, 2000, which was the date of the examination.  (Id. at 65).  The report
is, in fact, dated May 20, 2000.  (Id. at 184, 188).

disabled within the meaning of the Act, (id. at 34-49).  The Appeals Council subsequently

denied Rodriguez's request for review on January 4, 2002.  (Id. at 50-51).

      Rodriguez then sought review by this Court.  On August 13, 2002, pursuant

to a stipulation, Your Honor remanded the case for further administrative proceedings

pursuant to the sixth sentence of 42 U.S.C. § 405(g).[4]  (Id. at 52-53).  Thereafter, on

March 30, 2004, ALJ Reap held a third hearing and again found that Rodriguez was not

disabled.[5]  (Id. at 10-30; 313-65).  This decision became final on November 30, 2005,

when the Appeals Council denied further review.  (Id. at 4-5).

      On or about September 5, 2006, Rodriguez filed his motion for judgment on

the pleadings.  (Docket No. 8).  The Commissioner then cross-moved for judgment on the

pleadings on or about December 4, 2006.  (Docket No. 14).  On December 8, 2008, Your

Honor referred the case to me for a Report and Recommendation.  (Docket No. 20).

      The issue presented by both motions is whether the ALJ's determination

that Rodriguez was not under a "disability" within the meaning of the Act at any time

through December 31, 2003,[6] is legally correct and supported by substantial evidence.

---

[4]     A sixth sentence remand is "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding."  Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990).  The missing evidence in this case related to Rodriguez's mental health and ability to function in a work setting.  (R. 54).

[5]     At the hearing, the tapes and transcripts of the prior hearings were received in evidence.  (Id. at 15).

[6]     It is undisputed that, pursuant to 42 U.S.C. § 423(c), Rodriguez last met the insured status requirements on this date.

B.    Relevant Facts

     1.    Non-Medical Evidence

          a.    Rodriguez

Rodriguez testified at the March 2004 hearing that he was born on August 10, 1957, graduated high school, and completed twelve credits at a community college. (R. 315).  He worked as a Yonkers firefighter from 1979 through 1998.  (Id. at 475). From June 1995 to May 1998, he performed "light duty" for the fire department.  (Id. at 316, 328).  In that capacity, he answered phones, relayed messages to the chief, and answered questions.  (Id. at 316).  Rodriguez stopped working as a fireman due to low back pain and bilateral knee pain.  (Id. at 316-17, 328-29).  As of January 2000, he was receiving a state disability retirement pension and an additional "stipend" from the City of Yonkers.  (Id. at 113-14).

Rodriguez, who testified that he wore a custom-fitted knee brace, (id. at 327), said doctors have recommended certain surgical procedures since June 2001, (id. at 319).  He nevertheless failed to pursue those options because his knees got "progressively worse" after two prior surgeries on his right knee and one on his left knee, which had, in any event, provided only short-term relief.  (Id. at 319, 330-31).  At the time of the hearing, he was experiencing pain in both knees (although the right knee was worse), a burning pain in his back, and occasional sciatic pain.  (Id. at 331-34).  He also complained

4

of swelling of his knee twice a month, a condition which lasted a few days each time, as well as a constant tightness in his right knee.  (Id. at 332).

Rodriguez testified that he was unable to sit for any sustained period of time when he worked on light duty.  (Id. at 328-29).  Accordingly, he resorted to lying down periodically in a dorm room at the fire department, a practice which grew to be "too disruptive."  (Id. at 329-30).

Rodriguez stated that he drove himself places only rarely and that he had been driven to the hearing by someone else.  (Id. at 317-18).  If he had to visit a doctor, his wife or a friend would drive.  (Id. at 318).  He testified that he accompanied his wife to do shopping, but stayed in the car.  (Id.).  Rodriguez stated that his most comfortable position was lying down and that while he sometimes did laundry, he did no other household chores.  (Id. at 323).  He sometimes took short walks, but did not participate in social activities or errands.  (Id. at 323-24).

Rodriguez testified that he could not perform even a sedentary job because he had constant pain in his knees and lower back.  (Id. at 316-17).  He explained that he usually needed to move or lie down after twenty minutes of sitting.  (Id. at 326).  He stated that he could walk or stand for about twenty minutes.  (Id.).  He also was able to carry a grocery bag and a gallon of milk.  (Id. at 327).

Turning to his mental condition, Rodriguez testified at the 2004 hearing that he thought his depression had worsened since he first testified in 2000.  (Id. at 336).  At

the earlier hearing, when he was asked about his depression, he noted that he was no longer working, and then observed, "[b]asically . . . my life sucks." (Id. at 121).

        b.       Vocational Expert

Amy Leopold ("Leopold"), a vocational expert, testified at the hearing regarding Rodriguez's future employment prospects. Leopold categorized Rodriguez's former work as an active firefighter as heavy skilled work, and his subsequent light duty functions as sedentary. (Id. at 356). Leopold opined that a hypothetical person with Rodriguez's experience and functional deficits would be able to perform the jobs of receptionist, dispatcher, and security system monitor. (Id. at 357). She acknowledged, however, that if such a person were absent more than three times per month, it would affect his ability to perform any work. (Id. at 360-61).

        2.       Medical Evidence of Physical Impairment

        a.       Pre-Onset Treatment

Rodriguez received treatment for pain in his right knee and back for several years prior to his alleged onset date of May 14, 1998. In 1995, Rodriguez underwent arthroscopic surgery on his right knee, (id. at 531), and a 1996 MRI of his spine revealed

degenerative disc disease and spondylosis[7] at the T11-T12 and L5-S1 levels, as well as a

bulging disc at L5-S1, (id. at 563).[8]

          b.      <u>Subsequent Treatment</u>

          i.      <u>Dr. Cheryl Rubin - Treating Physician</u>

On October 13, 1998, Dr. Cheryl Rubin examined Rodriguez who was

complaining about knee discomfort.  (<u>Id.</u> at 170).  Dr. Rubin noted a mild varus[9]

deformation in his right knee, tenderness along the medial joint line, and lack of full knee

extension.  (<u>Id.</u>).  She indicated, however, that Rodriguez walked "well" and could flex

the knee "fairly well."  (<u>Id.</u>).  An x-ray taken that day revealed degenerative changes in

the knee, including persistent medial compartment narrowing, conditions that also had

been reflected on films a year earlier.  (<u>Id.</u>).  Dr. Rubin's diagnosis was that Rodriguez

had post-traumatic arthritis in his right knee, which "remain[ed] symptomatic" and

rendered him "unable to resume work related activities."  (<u>Id.</u>).  She recommended that he

---

[7]    Spondylosis refers to "any lesion of the spine of a degenerative nature." <u>Stedman's Medical Dictionary</u> (27th ed. 2000) ("<u>Stedman's</u>").

[8]    T11 and T12 are among the vertebrae in the thoracic or upper back region of the spine.  L5 is a vertebra in the lumbar or lower back region of the spine, which is immediately above the S1 vertabra in the sacral region of the spine.  <u>See</u> Apparelyzed, http://www. apparelyzed.com (last visited May 14, 2009).

[9]    Varus means "[b]ent or twisted inward toward the midline of the limb or body." <u>Stedman's</u>.

undergo a series of Synvisc injections[10] and also discussed the possibility of a total knee replacement or other surgical interventions in the future.  (Id.).

Rodriguez had three Synvisc injections between December 1998 and January 1999.  (Id. at 166-68).  On March 16, 1999, however, Rodriguez reported to Dr. Rubin that he had no significant relief despite the injections and continued to have pain at night or with prolonged standing or sitting.  (Id. at 165).  Dr. Rubin's examination revealed that Rodriguez had continued diffuse tenderness, in particular over the medial joint line, as well as a "pretty good" range of motion.  (Id.).  Dr. Rubin recommended observation, maintenance exercises, and another clinical check in six weeks.  (Id.).

At his examination on April 27, 1999, Rodriguez reported unchanged symptoms of night pain, medial joint line tenderness, and mild limitation of motion.  (Id. at 164).  Dr. Rubin recommended a trial of glucosamine and Cosamin DS for several months.  (Id.).  Rodriguez returned to Dr. Rubin on July 21, 1999, and reported no change in his pain despite taking the medication.  (Id. at 163).  His back was a "little bit" stiff and he had persistent symptoms and tenderness along the medial joint line, with some decrease in effusion.  (Id.).  Dr. Rubin recommended that Rodriguez continue to take the

---

[10]     Synvisc is a lubricant intended to alleviate osteoarthritis in the knees.  See About Synvisc, http://www.synvisc.com/about.aspx (last visited May 14, 2009).

Cosamin DS for a "couple of months." (Id.). She indicated that she considered him "unable to resume usual work[-]related duties" in the interim.[11] (Id.).

On his next visit to Dr. Rubin on September 15, 1999, Rodriguez reported that his condition had remained unchanged until a few weeks earlier, when he experienced increased back and knee pain after sitting in a car for several hours. (Id. at 162). Dr. Rubin noted that Rodriguez had lumbar paraspinal tenderness with some tightness, mild hamstring tightness, and some tenderness in the knee. (Id.). Rodriguez was walking "pretty well," but x-rays revealed degenerative changes at L5-S1 and T11-T12. (Id.). Dr. Rubin recommended further "physical therapy to work on general conditioning." (Id.).

Several months later, on January 3, 2000, Dr. Rubin reported that the results of her physical examination remained essentially the same, although Rodriguez's back and knee pain were milder, and he reported improvement as a result of physical therapy and home exercises. (Id. at 222). Dr. Rubin recommended an exercise program. (Id.).

When Rodriguez returned to Dr. Rubin on July 10, 2000, he reported a recent increase in back and knee pain following a long car ride and increased activity. (Id. at 221). On physical examination, Dr. Rubin determined that Rodriguez was walking "pretty well" and that there was no focal tenderness in his back. (Id.). Rodriguez had

---

[11]     Dr. Rubin's treatment notes for the July 21 visit conclude with the observation, "[t]hey will be present on a permanent basis." (Id. at 163). It is unclear to what this refers.

some tenderness in the right buttock, a "little bit of back discomfort," and "discomfort" in his left knee.  (Id.).

During a visit September 25, 2000, Rodriguez reported a new condition: pain in his left shoulder which began one month earlier after he slipped on the stairs and suffered an extension injury.  (Id. at 220).  Dr. Rubin's examination revealed tenderness along the anterior aspect of the shoulder, a moderately good range of motion, pain and stiffness in terminal forward flexion, and pain on passive internal rotation and a liftoff test.[12]  (Id.).  Rodriguez's shoulder x-rays were unremarkable except for minor degenerative changes.  (Id.).  Dr. Rubin diagnosed Rodriguez as having an acute subscapular[13] tendon strain, prescribed an oral NSAID,[14] and recommended a course of physical therapy.  (Id.).

A few weeks later, on October 12, 2000, Rodriguez reported that his left shoulder felt better, but that he was beginning to experience numbness in the first, second, and third fingers of his left hand.  (Id. at 219).  He also reported bilateral forearm pain

---

[12]      To perform a liftoff test, the patient stands and "is asked to place their hand behind their back with the dorsum of the hand resting in the region of the mid- lumbar spine. The dorsum of the hand is raised off the back by maintaining or increasing internal rotation of the humerus and extension at the shoulder."  See Lift-off Test, Shoulderdoc, http://www.shoulder doc. co.uk/article.asp?article=758 (last visited May 14, 2009).  "Inability to move the dorsum off the back constitutes an abnormal lift-off test and indicates subscapularis rupture or dysfunction." Id.

[13]      The scapula is commonly referred to as the "shoulder blade."  See Stedman's.

[14]      NSAID is an acronym for "nonsteroidal anti-inflammatory drugs," such as aspirin or ibuprofen.  Stedman's.

that began prior to his latest injury.  (Id.).  On examination, Dr. Rubin found tenderness around the subcapularis tendon, and a positive Phalen's test.[15]  (Id.).  She determined that Rodriguez might have early carpal tunnel syndrome and recommended a cock-up splint.[16]  (Id.).

During his visit on October 23, 2000, Rodriguez stated to Dr. Rubin that he was continuing his therapy and felt better, although his symptoms were not fully resolved and he still experienced numbness in his fingers despite the use of the splint.  (Id. at 218).  Upon examination, Dr. Rubin found that Rodriguez had better mobility in the shoulder, some tenderness around the subcapularis with mild shoulder discomfort on passive stretch, and a mildly positive Phalen's test.  (Id.).  She recommended continued therapy and considered electromyograph testing.  (Id.).

On November 20, 2000, Dr. Rubin indicated that Rodriguez was having some "little episodes of dysesthesias,"[17] but generally felt good.  (Id. at 212).  Dr. Rubin's physical examination showed that Rodriguez's spine was non-tender and that he had good range of motion, strength and functioning, with no focal neurological deficits.  (Id.).  Dr. Rubin recommended home exercise and follow-up as needed.  (Id.).

---

[15]      A Phalen's test is used to diagnose carpal tunnel syndrome.  Stedman's.

[16]      A cock-up splint immobilizes the wrist but leaves the fingers free.  See Cockup Splint, Medical Dictionary, http://medical-dictionary.thefreedictionary.com/cockup+splint (last visited May 14, 2009).

[17]      Dysesthesia is "[a] condition in which a disagreeable sensation is produced by ordinary stimuli."  Stedman's.

11

Rodriguez's next visit to Dr. Rubin was more than three years later, on December 17, 2003, at which time he sought a reevaluation of his right knee. (Id. at 293). Rodriguez reported "a few" recent episodes of flare-ups, and pain and swelling. (Id.). On examination, Dr. Rubin noted that Rodriguez was walking "pretty well." (Id.). He had diffuse tenderness mostly along the right knee medial joint line, a twenty to twenty-five degree deficit in flexion (but almost full extension), and some medial pain with rotational testing. (Id.). X-rays of his knees showed moderately severe medial compartment narrowing of the right knee and some minor patellofemoral changes in the left knee. (Id.). Dr. Rubin's clinical impression was recurrent symptoms of post-traumatic arthritis in the right knee. (Id.). She prescribed Cosamin DS and recommended that he resume using a knee brace for activity. (Id.). She also gave Rodriguez trial samples of Vioxx. (Id.).

On February 11, 2004, Rodriguez reported that he had taken Vioxx and Advil, was feeling "a lot better," and had knee pain reduced "to where [it] had been previously." (Id. at 292). Examination revealed "a little effusion of the knee," only a ten degree lack of flexion, and good extension. (Id.). Dr. Rubin recommended continued use of Cosamin DS and maintenance exercises. (Id.).

    ii.    Dr. Michael Robinson - Consulting and Treating Physician

On April 12, 1999, Dr. Michael Robinson examined Rodriguez at the request of the SSA. (Id. at 586-88). Rodriguez reported a history of low back pain and

12

bilateral knee pain following a series of injuries in 1987.  (Id. at 586).  Rodriguez further stated that he was independent in his daily living activities, including driving, and was able to lift ten to fifteen pounds, sit and stand for one-half hour and ambulate for fifteen to twenty minutes.  (Id. at 587).

During his physical examination, Dr. Robinson found that Rodriguez had a full range of motion across all joints although he had pain with end-range flexion at the knees and mild warmth of his right knee (possibly related to the use of a brace).  (Id.). Dr. Robinson further observed bilateral medial joint line tenderness, crepitus,[18] valgus[19] stress, pain with varus stress, and lateral collateral ligament laxity.  (Id.).  Rodriguez's patellar apprehension and grind tests were minimally positive.[20]  (Id.).  There was no evidence of effusion in the knees bilaterally.  (Id.).  Straight leg raising was negative in the sitting and supine positions.  (Id.).  Range of motion in the lumbar spine was limited to eighty degrees of flexion, ten degrees of extension, and fifteen degrees of lateral bending.  (Id.).

---

[18]     Crepitation is "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  Stedman's.

[19]     Valgus means "[b]ent or twisted outward away from the midline or body." Stedman's.

[20]     Patellar apprehension is "a sign of an unstable kneecap.  While the examiner places pressure on the kneecap, the patient may complain of the sensation that the kneecap is going to 'pop out' of its groove."  See Knee Examination, http://orthopedics.about.com/ od/hipknee/a/kneesymptoms_2.htm (last visited May 14, 2009).  Patellar grinding is "a nonspecific test where the examiner feels for abnormal grinding sensations under the kneecap with movement of the joint.  If pressure on the kneecap recreates the symptoms this may indicate the kneecap is the culprit."  Id.

Dr. Robinson's diagnosis was lumbar facet arthropathy[21] and bilateral moderately severe osteoarthritis of the knees involving primarily the medial compartments.  (Id.).  He described the prognosis for significant improvement of Rodriguez's pain and function as "poor," stating that, at some time in the future, Rodriguez would likely require total knee replacement.  (Id.).  Dr. Robinson concluded that Rodriguez should be able to work at a sedentary level with regard to lifting, standing, walking, pushing, pulling, and sitting, and that he had no limitation in his fine motor skills, hearing, or speaking.  (Id.).

After a second examination on April 4, 2000, Dr. Robinson reported that Rodriguez's symptoms remained essentially unchanged since his previous examination.  (Id. at 171).  Dr. Robinson's clinical impression was that Rodriguez's chronic low back pain likely was due to lumbar facet arthropathy, myofascial[22] pain syndrome, and bilateral osteoarthritis of the knees involving predominantly the medial compartments.  (Id. at 172).  He further noted that Rodriguez had a history of major affective disorder which was likely amplifying his pain.  (Id.).  Dr. Robinson's prognosis for significant improvement with conservative treatment was "guarded to poor" given the "persistence

---

[21]     Arthropathy refers to "[a]ny disease affecting a joint."  Stedman's.

[22]     The term "myofascial" relates to the "fascia surrounding and separating muscle tissue."  Stedman's.  A fascia is a "sheet of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles, and separates their several layers or groups."  Id.

of [Rodriguez's] pain syndrome over the course of the last several years without significant change in status." (Id.).  Functionally, however, he determined that Rodriguez would have only minimal limitations in climbing, sitting, walking, standing, lifting, and carrying.  (Id.).  He noted that Rodriguez was "able to drive short distances" and "perform activities of daily living independently."  (Id.).

Having examined Rodriguez twice at the behest of the Social Security Administration, Dr. Robinson later became a treating physician when Rodriguez consulted him on November 9, 2000, regarding his complaints of left shoulder pain and numbness and tingling in his left hand.  (Id. at 213-14).  Dr. Robinson scheduled Rodriguez for further testing and prescribed Celebrex.  (Id. at 214).

### iii.   Dr. Joseph DeFeo - Consulting Physician

On January 5, 2000, Dr. Joseph DeFeo examined Rodriguez in his office. (Id. at 143).  This examination apparently was conducted at the request of Rodriguez's counsel.  (See id. at 143, 150).  Dr. DeFeo observed that Rodriguez entered the office with an antalgic gait.[23]  (Id. at 144).  Rodriguez was using a custom brace on his right knee, and had difficulty getting on the examination table and into a supine position.  (Id.). On examination, Dr. DeFeo determined that Rodriguez's lumbo-sacral spine flexion was active to forty-five degrees.  (Id.).  He found evidence of paraspinal muscle spasm,

---

[23]      An antalgic gait is one in which the stance phase of walking is shortened on one side due to pain on weight bearing.  See Antalgic Gait, Medical Dictionary, http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited May 14, 2009).

especially on the left side, with active flexion.  (Id.).  Rodriguez had difficulty with heel-

to-toe walking.  (Id.).  His quadricep muscle strength was decreased on the right, as was

his extensor hallucis longus[24] strength.  (Id.).  Straight leg raising was to thirty degrees on

the right as compared with sixty degrees on the left, with a positive LaSegue sign.[25]  (Id.

at 145).  Rodriguez's sensation was normal, while his knee jerk was brisk and bilaterally

equal.  (Id.).

     Dr. DeFeo noted bilateral tibial bowing, especially on the right side.  (Id.).

In addition, he noted bilateral crepitus on flexion and extension.  (Id.).  There were

positive grind and inhibition tests.  (Id.).  Flexion was active only to one hundred degrees

bilaterally.  (Id.).

     On the basis of his examination, Dr. DeFeo concluded that Rodriguez had a

significant deficit of the lumbo-sacral spine and "an advanced disability centered around

both knees."  (Id. at 145-46).  He further determined that the disability was progressive.

(Id. at 146).  On the basis of his examination, Rodriguez's subjective complaints, and the

MRI results, Dr. DeFeo concluded that Rodriguez was "totally disabled."  (Id.).  He

opined that were Rodriguez to return to work, his restrictions – principally his inability to

---

[24]     The hallucis longus is a "muscle of [the] anterior (extensor/dorsiflexor) compartment of [the] leg."  Stedman's.

[25]     A positive LaSegue sign indicates "lumbar root or sciatic nerve irritation."  Stedman's.

16

sit or stand for extended periods and the need to avoid lifting, carrying, or repetitive

bending – would be so numerous as to preclude him from engaging in any gainful

employment.  (Id.).  He assessed Rodriguez's prognosis as "fair," (id.), and also

determined that Rodriguez's knee impairment met the SSA's clinical listing for Section

1.03, Arthritis of Major Weight-Bearing Joint, (id. at 147).

On a lumbar spine impairment questionnaire evidently provided to him by

Rodriguez's counsel, Dr. DeFeo's diagnosis was listed as "lumbo-sacral spondilosis/L-S

radiculitus, advanced degenerative arthritis of both knees; chondromalacia patella,[26]

multiple disc bulges with herniated disc at L5-S1."  (Id. at 150).  Dr. DeFeo opined that

the most weight Rodriguez could lift or carry occasionally was five pounds.  (Id. at 153).

He estimated that in an eight-hour work day, Rodriguez could sit or stand/walk for less

than an hour and would need to lie down every two to three hours.  (Id. at 152, 154).  He

also indicated that Rodriguez's pain was "constant" and not responsive to medication "to

any significant degree."  (Id. at 151).  Finally, although Dr. DeFeo indicated that his

speciality was orthopedics, he noted that Rodriguez could not tolerate even low stress at

work, a conclusion which was based on Rodriguez's use of antidepressants such as

Zoloft.  (Id. at 154).

On April 12, 2000, based solely on his examination on January 5, 2000, Dr.

DeFeo opined that Rodriguez was "totally, permanently disabled - unable to engage in

---

[26]     Chondromalacia patella is "a softening of the articular cartilage of the patella."
Stedman's.

gainful employment."  (Id. at 177, 179, 181).  In terms of limitations, however, Dr. DeFeo

found that Rodriguez could lift and carry for up to a third of a work day, but failed to

indicate a maximum weight.  (Id. at 180).  He also stated that Rodriguez could stand or

walk for fewer than two hours per day and could sit for up to six hours per day.  (Id.).

    iv.    <u>State Agency Medical Expert - Dr. Abdul Hameed</u>

On June 14, 2000, Dr. Abdul Hameed completed a Physical Residual

Functional Capacity assessment of Rodriguez based on his review of the file.  (Id. at 191-

97).  He determined that Rodriguez could frequently lift or carry ten pounds, could stand

or walk for at least two hours and sit for about six hours in an eight-hour workday, and

could push or pull without limitation.  (Id. at 192).  Dr. Hameed found that Rodriguez had

no manipulative, visual, communicative, or environmental limits.  (Id. at 194-95).  Dr.

Hameed also noted that he disagreed with the opinions expressed by Dr. DeFeo in his

report dated January 5, 2000, as they were based on only one visit.  (Id. at 196).

    v.    <u>2004 Hearing Testimony</u>

Consulting medical examiner Harold Bernanke,[27] a board-certified internist

at Montefiore Hospital in the Bronx, testified that Rodriguez's statements regarding his

knees and his need to lie down during the day were supported by objective evidence,

including a "good x-ray study" showing "narrowing of the medial compartment

bilaterally."  (Id. at 341, 351-53).  Dr. Bernanke opined, however, that while Rodriguez

---

[27]    The hearing transcript spells the doctor's name as Bernouke, but his curriculum
vitae establishes that this is incorrect.  (<u>Compare</u> id. at 96 <u>with</u> id. at 340).

experienced pain, his knee and back injuries did not meet or equal any listing-level

impairments.  (Id. at 348).  In particular, with respect to Rodriguez's knee problems, Dr.

Bernanke noted that to meet the listing, a claimant would have to be using a cane or

walker, which Rodriguez was not.  (Id.).  Dr. Bernanke similarly opined that Rodriguez's

psychiatric impairments did not equal a listing.  (Id. at 350).  When he was questioned by

Rodriguez's attorney, Dr. Bernanke agreed that Rodriguez could not work as a fireman,

but adhered to the view that he could do sedentary work.  (Id. at 352-53).

        3.      <u>Medical Evidence of Psychiatric Impairment</u>

        a.      <u>Treating Psychiatrist - Dr. Marc Tarle</u>

Rodriguez first met with Dr. Marc Tarle on December 6, 1999, shortly

before the initial hearing conducted by the ALJ.  At that time, Rodriguez reported a

history of low mood, energy, and concentration.  (Id. at 261).  Rodriguez described mid-

sleep awakenings, feeling argumentative and irritable, and having a pessimistic outlook

on the future.  (Id. at 156).  On mental status examination, Rodriguez was alert and

adequately dressed and groomed.  (Id. at 157).  His emotional tone was sad and

constricted.  (Id.).  His speech was slowed and depressive.  (Id.).  Rodriguez's thinking

was coherent and relevant and his attitude was generally friendly, but somewhat distant.

(Id.).  There was no indication of menacing behavior, volatility, or such psychotic

symptoms as delusions or hallucinations.  (Id.).  Rodriguez's insight and judgment were

19

intact, and he was oriented with no memory deficits.  (Id.).  He was not suicidal or

homicidal.  (Id.).

      Dr. Tarle's diagnosis as of March 2, 2000, was "Major Depression; Single

Episode," for which he had prescribed the antidepressants Prozac and Desyrel.  (Id.).  Dr.

Tarle noted that Rodriguez's improvement with medication had been modest:  he was

sleeping better with a lower sense of tension, but he continued to experience low mood,

irritability, and reduced concentration and energy.  (Id.).  According to Dr. Tarle, the

onset of Rodriguez's depression coincided with his "forced retirement" from the fire

department after nineteen years of service.  (Id. at 156).  Dr. Tarle noted that Rodriguez's

daily activities were limited, and that he had been unable to socialize or engage in

productive activities.  (Id.).  Dr. Tarle determined that Rodriguez's prognosis for recovery

from depression was "guarded," and that his condition would most likely exceed twelve

months in duration.  (Id. at 157).  Dr. Tarle noted that Rodriguez also showed signs of

Post-Traumatic Stress Disorder ("PTSD"), which needed to be ruled out.  (Id.).

      Rodriguez met with Dr. Tarle several times in the following year.[28]  (Id. at

257-60).  On March 30, 2001, Dr. Tarle reported that Rodriguez had improved with

respect to his symptoms of depression, but that his impairments in mood, concentration,

energy, and outlook continued, such that Rodriguez was unable to focus and direct

himself on a new career path.  (Id. at 254, 256).  Dr. Tarle found, however, that "the most

_____

[28]    The treatment notes from these sessions are largely illegible.

intense aspect of his depression has resolved with medication." (Id. at 254).  Rodriguez

was continuing to take Prozac and Desyrel, as well as a third antidepressant, Wellbutrin,

that recently had been added to his treatment regimen. (Id.).  Despite the medication,

Rodriguez continued to describe "low grade symptoms" of PTSD. (Id.).  On mental

status examination, Rodriguez appeared engaged and related, but had a depressed and

slowed down emotional tone. (Id.).  Rodriguez indicated that he was no longer seeing Dr.

Ellis Barowsky, his prior psychologist, but intended to make an appointment with a new

psychotherapist. (Id.).  Dr. Tarle's diagnosis was "Major Depression, Single Episode"

with "residual symptoms," and he once again noted a need to rule out PTSD. (Id. at 256).

Dr. Tarle also opined that Rodriguez's prognosis continued to be "guarded." (Id.).

Rodriguez next visited Dr. Tarle two years later on February 14, 2003. (Id.

at 280).  During that visit, Rodriguez reported that he had been off his medications for

one year. (Id.).  Dr. Tarle diagnosed Rodriguez as suffering from depression and PTSD

and prescribed Paxil. (Id.).  Rodriguez met with Dr. Tarle again on March 3, March 21,

April 14, and June 23, 2003. (Id. at 277-79).

On August 1, 2003, Dr. Tarle completed a Psychiatric/Psychological

Impairment Questionnaire for Rodriguez's attorneys. (Id. at 281-88).  He noted that he

had treated Rodriguez every two to three months, most recently on June 23, 2003. (Id. at

281).  Dr. Tarle assigned Rodriguez a Global Assessment of Functioning ("GAF") score

of 60, his highest score within the past year.[29]  (Id.).  Dr. Tarle's diagnosis was dysthymic

disorder[30] and PTSD, based on clinical findings of sleep and mood disturbances, social

withdrawal or isolation, decreased energy, and psychomotor retardation.  (Id. at 281-82).

He gave Rodriguez a guarded prognosis in light of his chronic symptoms, (id. at 281), but

noted that Rodriguez's prior history of major depression had resolved itself with

medication, (id. at 281, 289).  Rodriguez's primary continuing symptoms were low mood,

anhedonia,[31] decreased energy, social withdrawal, and preoccupation with traumatic

events.  (Id. at 283).

          Dr. Tarle opined that Rodriguez was mildly limited in his abilities to

understand, remember, and carry out detailed instructions; maintain attention and

concentration for extended periods; perform activities within a schedule; sustain ordinary

routine without supervision; work in coordination with others without distraction; and

make simple work-related decisions.  (Id. at 284-85).  Rodriguez was moderately limited

in his ability to complete a normal workweek without interruptions from psychologically-

---

[29]     GAF scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect
and circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers )."
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 23 (4th
ed. 1994) ("DSM-IV").

[30]     Dysthymic disorder is "a chronic disturbance of mood characterized by mild
depression or loss of interest in usual activities."  Stedman's.

[31]     Anhedonia is the "[a]bsence of pleasure from the performance of acts that would
ordinarily be pleasurable."  Stedman's.

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Id. at 285).  With respect to social interaction and adaptation, Rodriguez was mildly limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Id. at 285).  Dr. Tarle estimated that Rodriguez would be absent from work more than three times a month as a result of his impairments, but did not explain the basis for this conclusion.  (Id. at 288).

Less than one year later, on March 22, 2004, Dr. Tarle completed another questionnaire for Rodriguez's counsel.  (Id. at 300-07).  On this form, Dr. Tarle assigned Rodriguez a GAF of 58.  (Id. at 300).  Dr. Tarle's assessment of Rodriguez's daily functional limitations was essentially unchanged.  (Id. at 303-05).  Dr. Tarle also indicated that he was "not sure" how often Rodriguez might miss work.  (Id. at 307).

b.    Treating Psychologist - Dr. Ellis Barowsky

On January 31, 2000, Dr. Ellis Barowsky prepared an evaluation of Rodriguez's psychological status.  (Id. at 159-60).  Dr. Barowsky reported that Rodriguez had been under his care weekly for the treatment of his major depressive disorder and PTSD conditions, which primarily were the result of Rodriguez's severe physical limitations.  (Id. at 160).  He recommended that Rodriguez engage in non-physical activity to add some "more meaning in his life."  (Id.).  He further opined that it was

23

unlikely that Rodriguez would be fully symptom-free of the mood changes resulting from his physical pain and depression, and accordingly that it was unlikely that Rodriguez would be able to perform vocational functions uninterrupted by mood changes.  (Id.).

On May 20, 2000, Dr. Barowsky completed a disability determination form which indicated that he last had seen Rodriguez on May 5, 2000.  (Id. at 184-90).  Dr. Barowsky stated that Rodriguez had symptoms of chronic pain/depression, flashbacks of prior traumatic experiences as a firefighter, poor sleep, anxiety, and dysphoria.  (Id. at 184).  He noted that Rodriguez was undergoing individual psychotherapy treatment and was being seen by a psychiatrist for medication.  (Id. at 185).  In addition, Dr. Barowsky noted that Rodriguez was unstable and had outbursts due to low frustration tolerance. (Id.).  Dr. Barowsky's diagnosis, stated in terms of DSM-IV diagnostic codes, was that Rodriguez had Depression NOS (not otherwise specified) and PTSD.[32]  (Id. at 184).

Four years later, on March 10, 2004, Dr. Barowsky completed a medical source statement about Rodriguez's ability to do work.  (Id. at 296-97).  The only limitation he noted was that Rodriguez would be moderately limited in responding appropriately to work pressures in a usual work setting.[33]  (Id. at 297).

---

[32]      An index of DSM codes may be found at http://www.psychnet-uk.com/ dsm_iv/_misc/complete_tables.htm (last visited May 14, 2009).

[33]      Rodriguez contends that Dr. Barowsky had not seen him for several years by the time he completed this statement.  (See Pl.'s Am. Mem. of Law at 11).

c.    Dr. Leslie Helprin - Consulting Psychiatrist

On April 11, 2000, Dr. Leslie Helprin conducted a psychiatric evaluation of Rodriguez.  (Id. at 174).  During the mental status examination, Rodriguez was cooperative and had an adequate "overall presentation."  (Id. at 175).  His thought process was coherent and goal oriented, with no evidence of hallucinations, delusions, or paranoia.  (Id.).  Dr. Helprin concluded that Rodriguez's affect was dysphoric with a sad mood.  (Id.).  Rodriguez was alert and oriented in all three spheres and his attention and concentration were intact.  (Id.).  Rodriguez's memory skills were mildly impaired, and his intellectual skills were in the average range.  (Id.).

Dr. Helprin's diagnosis was "[m]ajor depressive disorder, moderate," but he determined that Rodriguez's prognosis was good given his current treatments.  (Id. at 176).  Dr. Helprin opined that Rodriguez was able to follow and understand simple directions, perform both simple and complex tasks independently, maintain attention and concentration for tasks, relate adequately with others, and deal appropriately with stress.  (Id.).  Dr. Helprin added that, "[w]hat might preclude him from working are his medical conditions.  Thus, examination results are not consistent with the claimant's allegations." (Id.).  He also recommended that Rodriguez "undergo medical evaluation to determine whether his medical conditions preclude him from working."  (Id.).

25

d.      Dr. Anibal Herrera - Consulting Psychiatrist

On March 31, 2003, Dr. Anibal Herrera examined Rodriguez at the request of his attorney.  (Id. at 166-68).  Rodriguez complained of "depression, anxiety, frustration, irritability, antagonistic behavior, anger, difficulty sleeping . . . , constant pain in both knees and back, [and] increased tension at home" due to these conditions.  (Id. at 266).  With respect to Rodriguez's mental status, Dr. Herrera noted that Rodriguez came to the appointment by himself and was friendly and cooperative.  (Id. at 267). Rodriguez's speech was relevant and coherent, and his thought processes were goal-directed.  (Id.).  His mood was anxious and depressed, but he had a tendency to cover up his feelings and seemed to be in denial regarding the need for treatment.  (Id.).  His affect was appropriate, but his attention and concentration "may [have been] impaired due to his worries and constant focus on his disability."  (Id.).  Dr. Herrera noted that Rodriguez's memory could be affected by his attention and concentration deficits.  (Id.).  His insight and judgment were fair to good, while his intelligence and general knowledge were average.  (Id.).

Dr. Herrera's diagnosis was "Mood Disorder Due to Pathology in Knees and Back with Depressive and Anxiety Features and Underlying Anger."  (Id. at 268). Dr. Herrera opined that Rodriguez's physical inability to perform his duties as a firefighter had triggered feelings of unworthiness, failure, and demoralization, accompanied by depressed mood, anxiety, extreme irritability, and argumentativeness.

26

(Id.).  Dr. Herrera further opined that Rodriguez would require long-term treatment for both his physical and emotional conditions.  (Id.).  Because Rodriguez's condition appeared to be chronic, Dr. Herrera considered his prognosis "guarded to poor."  (Id.).

On April 5, 2003, Dr. Herrera completed a Psychiatric/Psychological Impairment Questionnaire for Rodriguez's counsel.  (Id. at 269-76).  Dr. Herrera's clinical findings about Rodriguez included sleep and mood disturbances, feelings of guilt/worthlessness, generalized persistent anxiety, hostility and irritability.  (Id. at 270). Dr. Herrera determined that Rodriguez was markedly limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with others, complete a normal workweek without interruption from psychologically-based symptoms, get along with co-workers or peers without distracting them, and travel to unfamiliar places or use public transportation.  (Id. at 272-74). Rodriguez was moderately limited in the ability to understand, remember and carry out detailed instructions, interact appropriately with the general public, and respond appropriately to changes in the work setting.  (Id.).  In addition, Rodriguez was mildly limited in the ability to understand and remember one- and two-step instructions, sustain ordinary routine without supervision, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently.  (Id.).

Dr. Herrera indicated that increased pain under stress in any work situation would increase Rodriguez's depression, anxiety, and anger.  (Id. at 274).  He further stated that Rodriguez was incapable of even low work stress and, hence, was "unable to function in any work capacity."  (Id. at 275-76).

e.      Dr. Abdul Hameed - State Medical Expert

On June 14, 2000, Dr. Hameed, the physician who completed Rodriguez's Physical Residual Functional Capacity Assessment, also completed a Mental Residual Functional Capacity Assessment form based on his file review.  (Id. at 198-200).  Dr. Hameed found that Rodriguez had moderate limitations in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be reasonably punctual; and respond appropriately to changes in the work setting.  (Id. at 198-99).  Dr. Hameed further determined that Rodriguez could remember simple instructions, sustain an ordinary routine without special supervision, make appropriate work-related decisions, maintain a normal workweek, and respond to supervisors and co-workers appropriately.  (Id. at 198-200).

That same day, Dr. Hameed also completed a Psychiatric Review Technique form.  (Id. at 202-10).  With regard to "paragraph B" functional limitations, he determined that Rodriguez often experienced deficiencies in concentration, persistence or

28

pace.  (Id. at 209).  He also determined that Rodriguez had no restrictions of daily living

activities and only slight difficulties maintaining social functioning.  (Id.).

    3.    <u>ALJ Decision and Appeal</u>

       On April 30, 2004, the ALJ issued a decision on remand in which he found

that Rodriguez was not disabled on or before December 31, 2003.  (<u>Id.</u> at 14).  The ALJ

determined at Step One of the analysis that Rodriguez had not engaged in substantial

gainful activity during the relevant period.  (<u>Id.</u> at 16).

       At Step Two, the ALJ found that Rodriguez did not meet his burden with

respect to a shoulder impairment.  (<u>Id.</u>).  The ALJ did find, however, that Rodriguez had

"substantiated the existence of a severe lumbar degenerative disc and a post traumatic

arthritis right knee impairment."  (<u>Id.</u> at 17).  In reaching this conclusion, the ALJ gave

"considerable weight" to the opinion of Dr. Robinson, a consulting physician who had

examined Rodriguez.  (<u>Id.</u>).  With respect to the claimed mental impairments, the ALJ

found that Rodriguez had mild limitations in daily activities, social functioning, and

concentration, and no decompensation.  (<u>Id.</u> at 22).  In reaching this determination, the

ALJ rejected the findings of Dr. Herrera, who had examined Rodriguez once at the

request of his counsel.  (<u>Id.</u>).  The ALJ concluded that Dr. Herrera's findings were

inconsistent with the opinions of the other "mental professionals" and the fact that

Rodriguez was able to come to his appointment without anyone's assistance.  (<u>Id.</u>).

Although the ALJ determined that Rodriguez's mild limitations did not give rise to a

severe mental impairment, the ALJ gave him the "benefit of the doubt," and concluded, based on the longevity of Rodriguez's treatment, that he had a "severe mental impairment in the social security sense." (Id.).

At Step Three, the ALJ found that none of the medical testing or examinations established that Rodriguez had a condition that met or equaled the impairments listed in 20 C.F.R. § 404, Appendix 1, Subpart P ("Appendix 1"). (Id. at 23).

At Step Four, the ALJ assessed Rodriguez's residual functional capacity and determined that Rodriguez's claims of debilitating symptoms and functional limitations were "not wholly credible" for several reasons. (Id. at 23). First, the ALJ found that Rodriguez's alleged daily limitations could not be objectively verified. (Id.). Next, the ALJ found that Rodriguez's hearing testimony was inconsistent with statements made throughout the record. (Id.). For example, according to the medical reports, Rodriguez had admitted to performing light household chores, driving independently, and being able to lift up to fifteen pounds. (Id. at 23-24). In his hearing testimony, however, Rodriguez painted a picture of much more limited capabilities. (Id. at 317-18, 323-34). Although the ALJ acknowledged that Rodriguez may not have intended to be misleading, he considered the inconsistencies an indication that Rodriguez's information concerning his daily activities might not be entirely reliable.[34] (Id. at 24).

---

[34]     In his earlier decision, the ALJ more directly questioned Rodriguez's credibility.
(continued...)

In assessing Rodriguez's physical and mental limitations, the ALJ consequently attached greater weight to factors other than Rodriguez's self-reporting. (Id.).  Among other things, the ALJ noted that Rodriguez had not received "the type of medical treatment one would expect for a totally disabled individual," pointing to a gap in the treatment of his knee between 1999 and 2003 and a gap in his psychiatric treatment between 2002 and 2003.  (Id.).  The ALJ also noted that Rodriguez had a favorable response to physical therapy and medication with no documented side effects.  (Id.).  The ALJ further found that the clinical and physical findings since Rodriguez's alleged onset date militated against his allegations of disabling symptoms.  (Id.).  Among those findings from treating and examining sources were indications that Rodriguez was walking well and that his knee problems and mental functioning limitations were "mild."  (R. 24-26, citing, inter alia, id. at 211-14, 265-76, 281-88, 291-99, 300-07, 538-46, 581-88).

The ALJ therefore concluded that Rodriguez had the residual functional capacity ("RFC") to lift, carry, push, and pull up to ten pounds occasionally; sit up to six hours; stand and walk up to two hours; maintain adequate concentration, pace and persistence for tasks; make simple decisions; respond appropriately to supervisors and co-workers; and adapt to routine changes.  (Id. at 26).  Based on this RFC, the ALJ assessed

---

[34](...continued)
He noted that Rodriguez claimed that his "forced retirement" had caused his depression, but that the documentary record established, to the contrary, that Rodriguez applied for a disability retirement voluntarily and went so far as to pursue an appeal when the request was denied.  (Id. at 46).

that Rodriguez could perform his immediate past relevant work, which was sedentary in nature.  (Id.).  In an effort to avoid an unnecessary remand in the event this Court found that the determination  unsupported by substantial evidence, the ALJ also considered whether Rodriguez could perform other sedentary jobs that existed in significant numbers in the national economy.  (Id. at 27).  Based on Rodriguez's RFC, age, education, and work experience, the ALJ found there were such jobs, including work as a dispatcher or a system monitor.  (Id. at 27-28).  Accordingly, the ALJ held that Rodriguez was not under a disability within the meaning of the Act.  (Id. at 29).

By letter dated August 18, 2004, Rodriguez appealed the ALJ's denial of his claim, advancing two principal reasons for a reversal or remand.  (Id. at 6-7).  First, Rodriguez argued that the ALJ had failed to address Dr. Tarle's opinion that Rodriguez's impairments would cause him to miss three days of work per month, which allegedly negated the conclusion that there were sedentary jobs he could perform.  (Id. at 6).  Second, Rodriguez argued that the ALJ had not made particularized findings that would warrant the rejection of his claim of disabling pain.  (Id. at 7).

Administrative Appeals Judge Thomasine B. Carter responded by letter dated November 30, 2005.  (Id. at 4-5).  Although Judge Carter acknowledged that the ALJ's decision on remand did not specifically refer to the opinions of Dr. Tarle that Rodrigez cited, she noted that Dr. Tarle subsequently conceded in a Psychiatric/ Psychological Impairment Questionnaire that he "did not know how often [Rodriguez]

32

would . . . be absent from work" as a result of his impairments.  (Id. at 4, citing R. 307).

The judge also observed that Dr. Tarle had stated in an August 2003 letter to Rodriguez's

counsel that Rodriguez's major depression had been resolved with treatment.  (Id., citing

R. 289).

       Because the Appeals Council declined jurisdiction, ALJ Reap's decision on

remand constitutes the Commissioner's final decision.  (Id. at 5).

II.      Applicable Law

     A.     Standard of Review

       Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled

to judgment on the pleadings if it establishes that no material facts are in dispute and that

it is entitled to judgment as a matter of law.  Sellers v. M.C. Floor Crafters, Inc., 842 F.2d

639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14

(S.D.N.Y. 1999).

       A court is not permitted to review the Commissioner's decision de novo.

Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d

496, 501 (2d Cir. 1998)).  Rather, when the Commissioner's determination is supported

by substantial evidence, the decision must be upheld.  See Alston v. Sullivan, 904 F.2d

122, 126 (2d Cir. 1990); Ortiz v. Barnhart, No. 00 Civ. 9171 (RWS), 2002 WL 449858, at

*4 (S.D.N.Y. Mar. 22, 2002).

B.   Disability Determination

"Disability" is defined in the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In making a determination as to a claimant's disability, the Commissioner is required to apply the familiar five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920.  The Second Circuit has described that process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of this process. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the Commissioner finds that a claimant is disabled or not disabled at an early step in the process, she is not required to proceed with any further analysis. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work. DeChirico, 134 F.3d at 1180.

C.   Opinion of Treating Physician

Pursuant to SSA regulations, an ALJ is required to give controlling weight to a treating physician's opinion "when the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Colondres v. Barnhart, No. 04 Civ. 1841 (SAS), 2005 WL 106893, at *6 (S.D.N.Y. Jan. 18, 2005) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The regulations further mandate that if controlling weight is not given to the treating physician's opinion, the ALJ must consider a series of factors in determining the proper weight to give to that opinion. Id. Those factors include "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see 20 C.F.R. §§ 404.1527(d)(2)-(6),

35

416.927(d)(2)-(6).  The ALJ is further required to explain and provide "good reasons" for the failure to credit the treating physician's opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

If the ALJ fails to apply the correct standard in weighing a treating physician's opinion or fails to give good reasons for rejecting the opinion, a remand for further fact finding is the appropriate remedy.  Halloran v. Barnhart, 362 F.3d at 33; Dudelson v. Barnhart, No. 03 Civ. 7734 (RCC)(FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d at 506).

## IV.   Discussion

The sole issue before the Court is the correctness of the ALJ's determination that Rodriguez was not disabled within the meaning of the Act.  Rodriguez claims that the determination was improper because the ALJ failed to follow the treating physician rule and to evaluate properly Rodriguez's credibility.  (Pet'r's Mem. 20-25). The Commissioner denies these allegations and maintains that substantial evidence supported the decision that Rodriguez was not disabled.  (Comm'r's Mem. 17-25).

### A.   Treating Physician

Dr. Rubin was the only treating physician who addressed Rodriguez's knee and back problems.  In his decision, however, ALJ Reap did not credit Dr. Rubin's determinations that Rodriguez was unable to resume his work-related duties.  (R. 163,

36

170).  As the Commissioner correctly notes, the ALJ was not required to give controlling weight to Dr. Rubin's conclusion regarding the ultimate question of disability or nondisability.  (See Comm'r's Mem. of Law at 19) (citing 20 C.F.R. § 404.1527(e) (opinion on whether a claimant is disabled is reserved to the Commissioner); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.")).  Rather, whether a claimant is disabled or unable to work is a matter reserved for the Commissioner.  20 C.F.R. § 404.1527(e).

Rodriguez complains that the ALJ did not explicitly state the weight, if any, that he accorded to the remainder of Dr. Rubin's findings, including her conclusions that Rodriguez had a varus deformation, tenderness along the medial joint line, and post-traumatic arthritis.  (Id. at 162-65, 170, 293).  It is true that the ALJ stated only that he gave "considerable weight" to the opinion of consulting examiner Dr. Robinson.  (Id. at 17).  Nevertheless, in determining that Rodriguez's back and knee pain were severe, the ALJ relied, in part, on Rodriguez's "longitudinal treatment history."  (Id.) (emphasis added).  Accordingly, the ALJ plainly credited these aspects of Dr. Rubin's findings, even if he failed to describe the exact weight assigned to them.

Turning to Rodriguez's mental impairments, the ALJ also did not err in his evaluation of the opinions of Drs. Tarle and Barowsky, Rodriguez's treating psychiatrist and psychologist.  In his decision, the ALJ noted that Dr. Tarle's opinion was entitled to

37

"substantial weight," and that Dr. Barowsky's opinion was entitled to "special weight." (Id. at 19-20).  As the ALJ correctly stated, both of these treating sources recognized at most moderate limitations with respect to Rodriguez's ability to work, and otherwise found mild to no limitations.  (Id. at 284-86, 297).  Thus, Dr. Tarle determined that Rodriguez would be moderately limited with respect to completing a normal workweek without interruption and performing at a consistent pace, and mildly limited, inter alia, in his ability to understand detailed directions, maintain concentration, and get along with co-workers.  (Id. at 284-85).  Dr. Barowsky determined that Rodriguez would be unable to perform vocational functions uninterrupted by mood changes, and later stated that Rodriguez would be moderately limited in responding appropriately to work pressures. (Id. at 160, 297).  Yet, Dr. Barowsky also found no limitations in Rodriguez's ability to interact appropriately with supervisors and co-workers, and to respond appropriately to changes in a routine work setting.  (Id. at 297).

These opinions were consistent with most of the other evidence in the record.  For example, Dr. Hameed completed a residual functional capacity assessment in which he found that Rodriguez had limited ability to carry out detailed instructions and maintain attention, but also that he could carry out simple directions and respond appropriately to supervisors and co-workers.  (Id. at 198-99).  Similarly, Dr. Helprin, a consultative psychiatrist, found that Rodriguez could follow simple directions, perform tasks independently, maintain attention and concentration, relate to others, and deal

appropriately with stress.  (Id. at 176).  The only contrary voice was that of Dr. Herrera, the consultative psychiatrist retained by Rodriguez's counsel, who opined that Rodriguez was more markedly limited in certain areas, including his ability to maintain attention, work with others, complete a workweek without interruption, and get along with co-workers.  (Id. at 272-74).

Where such differences in medical opinion exist, the trier of fact is charged with resolving the conflict.  Richardson v. Perales, 402 U.S. 389, 399 (1971).  Here, the ALJ explained that he considered Dr. Herrera's opinion to be of "minimal probative value" because it was contrary to the other medical opinions, was completed at the request of Rodriguez, and was based on only one visit.  (R. 22).  Thus, the ALJ considered the relative weight he should assign to the various medical opinions regarding Rodriguez's mental impairments, and chose to give the opinions of the doctors other than Dr. Herrera controlling weight.  It follows that the ALJ's conclusion that Rodriguez was only mildly limited in his daily activities, social functioning, and concentration was proper since it accorded substantial weight to the treating sources' opinions.

B.    Rodriguez's Credibility

Rodriguez also contends that the ALJ improperly assessed his credibility because (1) an ALJ cannot reject a claimant's testimony by requiring a showing of objective findings for pain "beyond what is necessary," (2) a claimant need not make frequent trips to the doctor to substantiate his claim of disability, and (3) his testimony

39

regarding his pain was not addressed in the ALJ's decision.  (Pet'r's Mem. 24-25).  The Commissioner counters that the ALJ properly rejected Rodriguez's testimony about disabling pain because it was inconsistent with the medical and other evidence in the record.  (Comm'r's Mem. 22).

       The regulations set forth a two-step process to evaluate a claimant's testimony regarding his symptoms.  Murphy v. Barnhart, No. 00 Civ. 9621 (JSR)(FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003).  First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant.  Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. Jul. 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b).  Second, if the ALJ determines that the claimant has such an impairment, he must evaluate the "intensity, persistence, and limiting effects" of the claimant's symptoms.  Sarchese, 2002 WL 1732802, at *7  (internal quotation marks omitted); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If the claimant's statements about his symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility.  Sarchese, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *2.  Such an evaluation of a claimant's credibility is entitled to great deference if it is supported by substantial evidence.  Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999).  See also Bomeisl v. Apfel, No. 96 Civ. 9718 (MBM), 1998 WL 430547, at *6

(S.D.N.Y. Jul. 30, 1998) ("findings [as to claimant's credibility] are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing").

In assessing the claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony.  See Rivera v. Apfel, No. 94 Civ. 5222 (MBM), 1999 WL 138920, at *8 (S.D.N.Y. Mar. 15, 1999) (ALJ must state specific reasons for rejecting claimant's statements as not credible); Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998) (same); SSR 96-7p, 1996 WL 374186, at *4 ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.").  The regulations require the ALJ to consider not only the objective medical evidence, but also:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)); see also Sarchese, 2002 WL 1732802, at *7 (listing factors).

41

In his decision, the ALJ concluded that Rodriguez had severe back and knee impairments. (R. 17). He then considered Rodriguez's hearing testimony regarding the effects of those impairments on his daily activities. (Id. at 23). Although the ALJ's decision did not detail Rodriguez's testimony about his pain, it did consider Rodriguez's statements regarding his allegedly debilitating symptoms. (Id.). In keeping with the regulations, the ALJ also properly assessed whether Rodriguez's claims of functional limitations and symptoms were supported by objective medical evidence. (Id.). Indeed, the ALJ thoroughly reviewed the medical evidence, noting Rodriguez's favorable response to physical therapy and medication and mild to normal impairments on physical examination. (Id. at 24-25). Moreover, the ALJ did not limit his inquiry to the objective medical findings, instead looking to the evidence of Rodriguez's daily limitations and access to treatment.

The ALJ also gave specific reasons for his adverse credibility determination, including the gaps in Rodriguez's treatment and the inconsistencies between his hearing testimony and the remainder of the record. (Id. at 23-24). Although a gap in treatment need not negate a finding of disability otherwise supported by the record, such a gap is an appropriate part of the ALJ's inquiry into whether the claimant is in fact disabled. See Shaw, 221 F.3d at 133. Taken in conjunction with the ALJ's thorough consideration of the medical evidence as a whole, his assessment of Rodriguez's treatment history was properly a factor in his credibility determination. The ALJ's

42

determination accordingly must be accorded deference and is not a ground for setting aside his disability determination.

    C.    <u>Substantial Evidence</u>

        The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g); <u>see</u> <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401 (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).  Here, as detailed below, there was substantial evidence to support the Commissioner's findings at the first four steps of the disability analysis.

    1.    <u>First Step</u>

        The first step of the sequential analysis asks whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  In that regard, at the hearing, Rodriguez testified that he stopped working in 1998 because of his alleged disability.  (R. 329).  Crediting that testimony, the ALJ determined that Rodriguez had not engaged in substantial gainful activity since then.  (<u>Id.</u> at 16).  This finding benefitted Rodriguez.

2.      Second Step

At the second step of the sequential process, the ALJ must determine whether the claimant has a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is one "which significantly limits the abilities and aptitudes necessary to do most jobs."  Bowen v. Yuckert, 482 U.S. 137, 146 (1987) (quoting 20 C.F.R. §§ 404.1520(c) & 404.1521(b)) (internal quotation marks omitted).

The ALJ determined that Rodriguez suffered from a "severe lumbar degenerative disc and a post traumatic arthritis right knee impairment," as well as a severe mental impairment.  (R. 17, 22).  Given Rodriguez's history of doctor's visits and medication for these conditions, there plainly was substantial evidence to support the ALJ's conclusions.  Once again, this finding benefitted Rodriguez.

3.      Third Step

The third step of the sequential evaluation asks whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1.  If so, the Commissioner must find that the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  As set forth below, the ALJ correctly determined that Rodriguez's ailments did not meet or medically equal the listed impairments in Appendix 1.  (R. 23).

Section 1.04 of Appendix 1 lists disorders of the spine, including degenerative disc disease.  To meeting the listing, however, the condition must be evidenced by various symptoms or tests, for example, a positive straight-leg raising test in

44

the sitting and supine positions.  Appendix 1 §§ 1.04(A)-(C).  Here, Dr. Robinson found that a straight-leg raising test was negative in both sitting and supine positions, and the other criteria justifying a finding of disability do not appear to have been met.  (R. 587).

There is no listing for post-traumatic arthritis of the knee.  Section 1.03 of Appendix A, which lists reconstructive surgery of a major weight-bearing joint, is close to what Rodriguez experienced.[35]  To meet this listing, however, Rodriguez also would have to demonstrate an inability to ambulate effectively, which is defined as an extreme limitation of the ability to walk.  Appendix 1 §§ 1.00(b); 1.03.  Rodriguez has failed to establish any such limitation.

Turning to mental impairments, Section 12.04 of Appendix 1 outlines the criteria for affective disorders.  To satisfy the listing criteria under this section, a claimant must demonstrate either (i) the presence of enumerated symptoms under paragraph A, plus at least two enumerated difficulties related to daily living, social functioning, concentration or decompensation under paragraph B, or (ii) a chronic affective disorder of two years' duration affecting basic work activities, plus (under paragraph C) repeated decompensation episodes, a residual disease process, or a one-year history of inability to function outside of a supportive living arrangement.  Appendix 1 § 12.04(A)-(C).

Rodriguez unquestionably has demonstrated several of the listed depressive symptoms in paragraph A, including anhedonia, sleep disturbance, and feelings of guilt

---

[35]     Dr. DeFeo concluded that this listing was satisfied.  (See id. at 147).

and worthlessness.  Id. § 12.04(A)(1).  Despite these symptoms, however, Rodriguez's daily living and related activities are at most moderately restricted.  Accordingly, the paragraph B criteria are not satisfied.  In addition, the record does not evidence the sort of chronic problems required under paragraph C.

The ALJ therefore properly progressed to the fourth step.

### 4.    Fourth Step

In the fourth step of the sequential evaluation, an ALJ must determine a claimant's RFC, or what the claimant can do despite his or her impairments.  20 C.F.R. § 404.1545(a)(1).  If the claimant can still perform past work, the ALJ must find that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

The Commissioner's RFC assessment "must address both the remaining exertional and nonexertional capacities of the individual."  SSR 96-8p, 1996 WL 374184, at *5 (Jul. 2, 1996).  "Exertional" capacities refer to how a claimant's impairments and related symptoms affect the ability to perform the seven strength demands of sitting, standing, walking, lifting, carrying, pushing, and pulling.  Id.  "Nonexertional" capacities refer to "physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions," including postural, manipulative, visual, communicative, and mental restrictions.  Id. at *6.  The RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  Id. at *7; see 20 C.F.R. § 404.1529.

46

Under the SSA regulations, there are five levels of physical exertion requirements for work in the national economy: sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. Work is considered "sedentary" if it

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Here, the ALJ concluded that Rodriguez was able to perform the exertional requirements for his past relevant work, which was sedentary in nature, or other sedentary jobs. (R. 26, 29). In reaching this conclusion, the ALJ determined that Rodriguez's claims of debilitating symptoms and functional limitations were not wholly credible. (Id. at 23). As noted above, the ALJ's credibility determination was properly based on the regulation criteria, and is entitled to deference.

Based on the record, the ALJ determined that Rodriguez had the RFC to lift, carry, push, and pull up to ten pounds occasionally; to sit up to six hours; to stand and walk up to two hours; to maintain adequate concentration, pace, and persistence for tasks; to make simple decisions; to respond appropriately to supervisors and co-workers; and to adapt to routine changes. (Id. at 26).

47

The record supports these conclusions.  Dr. Robinson determined that Rodriguez could lift, stand, walk, push, pull and sit at the sedentary level.  (Id. at 587).  Similarly, Dr. DeFeo found that Rodriguez could lift and carry for up to a third of the work day, could stand or walk for up to two hours, and could sit for up to six hours.  (Id. at 180).[36]  The state medical expert, Dr. Hameed, also found that Rodriguez could lift ten pounds, could stand or walk at least two hours, could sit about six hours, and could push or pull without limitation.  (Id. at 192).

The record also contains support for the ALJ's conclusions regarding the impact of Rodriguez's psychological symptoms.  Drs. Tarle, Barowsky, and Hameed all opined that Rodriguez would have some limitations or interruptions in his workplace functionality, but those limitations were mostly moderate or mild.  (Id. at 160, 198-99, 284-86, 297, 303-05).  Dr. Helprin similarly expressed the view that Rodriguez would be able to follow directions, perform tasks, maintain attention, and relate adequately with others.  (Id. at 176).  Dr. Herrera's opinion alone identified more marked restrictions in Rodriguez's workplace competencies.  (Id. at 272-74).  Although the ALJ could of course have credited Dr. Herrera's opinion, he chose not to do so.  Since there is substantial evidence to support his findings, this was his prerogative.

---

[36]     In an earlier report Dr. DeFeo opined that Rodriguez would need to get up and move every hour if sitting and would need to lie down every two to three hours.  (Id. at 152, 154).

V.     Conclusion

Accordingly, the ALJ's determination with respect to the first four steps of the sequential process was legally correct and supported by substantial evidence. The Commissioner's motion for judgment on the pleadings therefore should be granted, and Rodriguez's motion should be denied.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Barbara S. Jones and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Jones. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

Dated:        New York, New York
              May 15, 2009

                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge

49

Copies to:

Charles E. Binder, Esq.
Binder and Binder
215 Park Avenue South, 6th Floor
New York, New York 10003

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007